IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| Melvin Johnson, ) | |
| ) | Civil Action No. 7:05-2785-HMH-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| USF Holland, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The plaintiff, who is proceeding *pro se*, alleges that the defendant, his former employer, discriminated against him because of his race and terminated his employment for retaliatory reasons in violation of Title VII of the Civil Rights Act of 1964, as amended.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

The defendant filed a motion for summary judgment on July 10, 2006. By order filed on July 11, 2006, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the dismissal procedure and the possible consequences if she failed to adequately respond to the motion. The plaintiff filed a response to the defendant's motion on August 11, 2006.

## **FACTS**

The defendant is a trucking company serving customers primarily in the southeast and north. The plaintiff was hired by the defendant on October 2, 1999, as a

casual employee[1] at the defendant's terminal in Spartanburg (*id.* ¶ 3).  A casual employee is typically not assigned a regular work schedule and is not eligible for union membership.  Rather, casual employees work only on an as-needed basis (John Watson aff. ¶¶ 1-3, def. m.s.j., ex. A).  However, according to the plaintiff, he typically worked each weekday and had reasonably standard working hours.  The plaintiff's responsibilities included cleaning up the dock, loading and unloading pallets, and moving trailers at the terminal as needed  (pl. dep. 24-28, def. m.s.j., ex. B).

The basis for the plaintiff's lawsuit against the defendant arises out of an incident involving one of his supervisors, Todd Druley (pl. dep., ex. 1 at 3).  Other than the plaintiff and Mr. Druley, no one witnessed the incident (pl. dep. 57).  The incident occurred on July 8, 2004, the last day on which the plaintiff performed work for the defendant (pl. dep. 29 , ex. 1 at 3). In the Statement of Claim in his original complaint, the plaintiff describes the incident as follows:  "I was sent home because I told the 3 week old supervisor not to call me Bo and my name was not Bo.  After some words between he and I about calling me Bo, I was told to leave by Todd who had been with the Company 3 wk." (pl. dep. ex. 1 at 3).

According to the plaintiff, the use of the term "Bo" was reasonably common at the facility (pl. dep. 31-34).  The plaintiff testified that he specifically recalls two white employees who were friends calling one another "Bo" in a joking manner and a white supervisor also referring to each of these employees as "Bo" (pl. dep. 33).  The plaintiff testified that employees at the terminal would use the term "Bo" to "nit-pick and grab around with each other" and, with the exception of himself, he is not aware of any employees who were offended by the use of the term (pl. dep. 34-35). When asked to provide an example of how the term was typically used in conversation at the terminal, the plaintiff testified, "A driver would come in and he'll say, I got so and so. Okay, put it up in door 16, Bo " (pl. dep.

---

[1]The majority of the defendant's non-management employees at the Spartanburg facility are union members whose employment is governed by a detailed collective bargaining agreement (Watson aff. ¶ 2).

2

41). The plaintiff testified that, in his opinion, because the term "Bo" is one letter short of "boy," it is degrading to a black man (pl. dep. at 39). According to the plaintiff, when the term was directed to him by non-managerial co-workers, he politely asked them not to call him "Bo" (pl. dep. 36). The plaintiff testified that none of these co-workers used the term in reference to him again (pl. dep. 36).

Prior to the incident on July 8th involving Todd Druley, the plaintiff never informed anyone in management that he was offended by the use of the term "Bo" (pl. dep. 43). This is true despite the fact that Mr. Druley had allegedly used the term "Bo" in reference to the plaintiff prior to July 8th (pl. dep. 38). According to the plaintiff, when Mr. Druley referred to him as "Bo" in these instances he "would just walk off" in order to avoid a confrontation (pl. dep. 39). The plaintiff does not know if Mr. Druley intended to degrade him by referring to him as "Bo" (pl. dep. 40).

The plaintiff testified that on July 8th he was performing his typical responsibilities when Mr. Druley came out to the dock and said, "You've got four today, Bo." In response to this statement, the plaintiff responded, "Don't call me Bo." Mr. Druley thereafter said, "What's wrong with you, Melvin?" At this point, the plaintiff, who was sitting on a tow motor, jumped off of the tow motor toward Mr. Druley and in doing so, tore his pants. After jumping off of the tow motor, the plaintiff stood within a foot and a half of Mr. Druley and removed the face mask he was wearing. The plaintiff testified that after he removed his face mask, Mr. Druley told him to stop spitting on him. Although the plaintiff admits to speaking in a "high tone," he denies intentionally spitting on Mr. Druley or poking him in the chest. Following a further heated verbal exchange, the particulars of which the plaintiff does not recall, Mr. Druley asked the plaintiff to go home. The plaintiff responded, "No." Instead, the plaintiff went into the office building to locate John Watson, the terminal manager, who was not in the office that day. As a result, the employees in the office told the plaintiff to go home and come back to speak with Mr. Watson the following day. Following a discussion between

Mr. Druley and another supervisor about the necessity of calling the police, the plaintiff agreed to voluntarily leave the terminal (pl. dep. 51-59).

The following afternoon the plaintiff met with Mr. Watson and Mr. Druley to discuss the incident. The plaintiff does not recall what was said by Mr. Watson in the meeting; however, he does recall telling Mr. Watson that he had nothing for which to apologize. He also recalls Mr. Druley asking the plaintiff to excuse him for his role in the incident because he had not had much sleep and had a headache at the time of the incident (pl. dep. 64). Mr. Watson told the plaintiff to apologize to Mr. Druley for his behavior on July 8th and informed him that until he did so the issue would remain unresolved (Watson aff. ¶ 5; pl. dep. 72). Although the plaintiff met with Mr. Watson on two subsequent occasions to discuss the incident, he never apologized to Mr. Druley (pl. dep. 60).

The decision not to allow the plaintiff to return to work was made by Mr. Watson (Watson aff. ¶ 5). According to Mr. Watson, he did not allow the plaintiff to work because the plaintiff refused to apologize for his role in the July 8th incident in which he acted in a manner that was disrespectful to his supervisor by becoming confrontational and refusing to immediately and voluntarily comply when he was told to go home (Watson aff. ¶ 5). The plaintiff has not alleged any discriminatory or improper conduct on the part of Mr. Watson nor has he presented evidence of any alleged improper conduct. The plaintiff admits that Mr. Druley never made any other allegedly inappropriate comments of any nature to him, racial or otherwise (pl. dep. 42). The plaintiff testified that prior to the incident that resulted in his termination, he had no problems with Mr. Watson or the other members of management at the terminal (pl. dep. 60). The plaintiff alleges that his employment was wrongfully terminated on the basis of his race and in retaliation for his exercise of free speech (pl. dep. 17).

The plaintiff testified:

Q: Okay. Other than Todd's use of the Bo on July 8, do you have any other basis for believing that your employment was terminated as a result of racial discrimination?

> A: I'm not going to say my race has anything to do with it but it did after he terminated me.
>
> Q: What do you mean by that?
>
> A: Because I am the first black and the only black I know that was sent home and the job was taken. There are some incidents that happened on that dock while I was working there and those guys are still there full-time.

(Pl. dep. 42-43).

When questioned regarding these alleged incidents, the plaintiff identified three situations involving alleged dissimilar treatment of white employees. Each situation involved alleged inappropriate conduct by full-time employees, all of whom were union members at the time the alleged incident occurred (pl. dep. 78). The first situation involved two white, non-management employees who purportedly bickered with one another for some period of time prior to burying the hatchet of their own accord (pl. dep. 75-76). The second situation involved a white employee who allegedly made a threatening remark to a white co-worker (pl. dep. 77). According to the plaintiff, the employee who made the threat was immediately terminated, but may have been put back to work several weeks later for reasons unknown to the plaintiff (pl. dep. 77). The third and final situation identified by the plaintiff involved two white employees who allegedly "got to bumping bellies" and "had a few words" (pl. dep. 78). According to the plaintiff, Mr. Watson had a talk with these employees and "that cooled that off" (pl. dep. 78). The plaintiff has no knowledge of whether these employees were disciplined (pl. dep. 78). None of the incidents cited by the plaintiff directly involved a supervisor or alleged inappropriate conduct toward a supervisor (pl. dep. 76).

## **APPLICABLE LAW**

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## ANALYSIS

Under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973), the allocation of proof is as follows: (1) the plaintiff-employee must first establish a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant-employer to articulate a legitimate non-discriminatory reason for its actions; and (3) if the defendant carries this burden, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802-03).

In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 147 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519) (emphasis in original). However, the Court also stated that, under the appropriate circumstances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer

7

unlawfully discriminated." *Id*. It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair – but nondiscriminatory – employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *Ross*, 759 F.2d at 365.

It appears that the plaintiff may be asserting a claim for hostile work environment. To state a hostile work environment claim, the plaintiff must allege that: (1) he experienced unwelcome harassment; (2) the harassment was based on his race ; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Bass v. E.I. Dupont de Nemours*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.1998)). Assuming there is evidence that the alleged harassment was motivated by his race, the plaintiff's hostile environment claim still fails because the harassment was not sufficiently severe or pervasive to create an abusive atmosphere or to otherwise alter the plaintiff's conditions of employment. In evaluating whether harassment is severe and pervasive so as to make it actionable under Title VII, the court "must examine the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hopkins v. Baltimore Gas & Electric*, 77 F.3d 745, 753 (4th Cir. 1996) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

Viewing the evidence in a light most favorable to the plaintiff, Mr. Druley referred to the plaintiff as "Bo" on several occasions before the plaintiff informed him on July 8th that he found the word degrading. The plaintiff admits that white employees were also referred to as "Bo" and that the use of the term did not appear to offend anyone other

than him. Considering the law set forth above, the conduct alleged by the plaintiff clearly is not sufficiently severe or pervasive to state a claim as a matter of law. Accordingly, summary judgment should be granted as a matter of law.

The plaintiff further alleges disparate treatment by the defendant. In order to establish a *prima facie* case of race discrimination, the plaintiff must show that (1) he is a member of a protected class; (2) an adverse employment action was taken against him; (3) other employees of a different race engaged in similar or comparable conduct; and (4) the adverse employment action taken against him was more severe than the action taken with regard to such similarly situated employees. *See Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985). The plaintiff cannot meet the last two elements.

The plaintiff identified three situations in which he contends white employees were treated differently than he was treated:

(1)    Two white, non-management employees purportedly bickered with one another for some period of time prior to burying the hatchet of their own accord (pl. dep. 75-76).

(2)    A white employee allegedly made a threatening remark to a white co-worker (pl. dep. 77). According to the plaintiff, the employee who made the threat was immediately terminated, but may have been put back to work several weeks later for reasons unknown to the plaintiff (pl. dep. 77).

(3)    Two white employees allegedly "got to bumping bellies" and "had a few words" (pl. dep. 78). According to the plaintiff, Mr. Watson had a talk with these employees and "that cooled that off" (pl. dep. 78).

Each situation involved alleged inappropriate conduct by full-time employees, all of whom were union members at the time the alleged incident occurred. None of the incidents cited by the plaintiff directly involved a supervisor or alleged inappropriate conduct toward a supervisor or a failure to apologize for such conduct (pl. dep. 76-78). Based upon

the foregoing, the plaintiff has failed to show that similarly situated white employees were treated more favorably than he was treated. Accordingly, the claim fails.

The plaintiff also alleges a claim of retaliation. In order to establish a *prima facie* case of retaliation, the plaintiff must show that (1) he engaged in a protected activity; (2) the employer took adverse employment action against him; and (3) a causal connection existed between the protected activity and the asserted adverse action. *Matvia v. Bald Head Island Mgmnt., Inc.,* 259 F.3d 261, 271 (4th Cir. 2001) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001)). The plaintiff contends that the defendant terminated his employment because he objected to being called "Bo" by his supervisor. Assuming that the plaintiff can establish a *prima facie* case of retaliation, the defendant can articulate a legitimate, nondiscriminatory reason for its decision to terminate the plaintiff's employment – namely, the plaintiff's failure to apologize for his role in the incident that occurred on July 8th (Watson aff. ¶ 5). Accordingly, in order to survive the motion for summary judgment, the plaintiff must present evidence that the proffered basis for his termination is pretext for retaliation. The plaintiff has failed to present evidence that either the defendant's stated basis for terminating his employment is not credible or that the decisionmaker, Mr. Watson, harbored racial animus. The plaintiff has come forward with absolutely no evidence of pretext. Accordingly, the retaliation claim fails.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is recommended that the defendant's motion for summary judgment be granted.

IT IS SO ORDERED.

s/William M. Catoe
United States Magistrate Judge

September 19, 2006
Greenville, South Carolina